**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 15-562** |
| | : | |
| **v.** | : | |
| | : | |
| **DEREK SPENCER** | : | |

<u>**MEMORANDUM OPINION**</u>

Savage, J.                                                    February 12, 2021

Moving for a reduction of sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), Derek Spencer, a prisoner at FCI Fort Dix, contends that his serious health condition and the COVID-19 pandemic constitute extraordinary and compelling reasons warranting a reduction of his sentence. Spencer claims that he is not a danger to the community, and that he suffers from significant health problems, including a serious seizure disorder, for which he is not receiving proper medical care. The government argues that Spencer's health conditions are well-controlled with medication and treatment in prison, and he is likely to recidivate, presenting an economic danger to the community.

On April 12, 2016, Spencer pled guilty to one count of bank fraud and three counts of aggravated identity theft. While on supervised release pending sentencing, he was arrested and admitted to committing additional fraud. On February 13, 2018, Spencer was sentenced to 48 months' imprisonment followed by five years of supervised release. He is scheduled to be released on October 13, 2021. He has been disciplined twice for unauthorized possession of cigarettes and a cell phone while in prison.

Spencer is 46 years old and suffers from a chronic seizure disorder. Though he takes anti-seizure medication, he has suffered at least seven grand mal seizures in

custody. He has lost motor function along the right side of his body, including his right hand, from the seizures. On April 1, 2020, he tested positive for tuberculosis. Though he requires additional treatment and tests, including a CT scan of his brain and a chest x-ray, he had not received this follow-up care at the time of the parties' briefing.

After considering all the factors set forth in 18 U.S.C. § 3553(a) and the circumstances of Spencer's compromised health, the COVID-19 pandemic, the significant outbreak of COVID-19 at his facility, his inability to obtain proper medical care in prison and the close proximity of his release date, we conclude that Spencer has presented an extraordinary and compelling reason warranting a sentence reduction. We also find that he is not a danger to the community. Therefore, we shall grant his motion and reduce his sentence.

## Compassionate Release

### *The Historical Statutory Framework*

A court may reduce a defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a), if it first finds that extraordinary and compelling reasons warrant a reduction and "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Before ordering the release of a prisoner, the court must determine that he is not a danger to the safety of others or the community. 18 U.S.C. § 3142(g).

Congress did not define what constitutes an extraordinary and compelling reason, leaving it to the Sentencing Commission to do so. In its policy statement and commentary addressing Section 3582(c)(1)(A), the Sentencing Commission set forth three specific

extraordinary and compelling reasons. U.S.S.G. § 1B1.13, cmt. n. 1. Application Notes 1(A) through 1(C) detail qualifying medical, age and family circumstances.

Making it clear that these were not the only reasons that may be considered extraordinary and compelling, the Sentencing Commission added an "other reasons" category that provides a reduction may be warranted by an "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, cmt. n. 1(D). At the same time, it delegated the Bureau of Prisons ("BOP") Director to define what "other reasons" qualify under subdivision 1(D). *Id.*

In exercising its delegated authority, the BOP issued Program Statement 5050.49 setting forth its criteria for compassionate release.[1] The Program Statement included criteria for granting requests based on medical, age and family circumstances. It also listed factors to be considered for all requests.[2] After passage of the First Step Act (FSA), the BOP amended the Program Statement outlining the circumstances that it deemed may justify relief.[3] However, those circumstances were limited to the same bases

---

[1] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.49 (Aug. 12, 2013), available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

[2] *Id.* at 3-10. Similar to the Section 3553(a) factors, these factors include the nature and circumstances of the offense, the defendant's criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustments, disciplinary infractions, the defendant's personal history derived from the Pre-Sentence Report, the length of the defendant's sentence and the amount of time served, the defendant's current age, the defendant's age at the time of the offense and sentencing, any release plans and whether release minimizes the severity of the offense. *Id.* at 10.

[3] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.50 (Jan. 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. These changes include requiring inmates be informed of the availability and process for sentence reductions, modifications to the definition of "terminally ill," requiring notice and assistance for terminally ill inmates, requiring requests for terminally ill inmates be processed within 14 days, requiring notice and assistance for debilitated offenders and specifying that inmates may file motions directly in court after exhausting administrative remedies or 30 days from the receipt of the request by the warden. *Id.* at 3.

identified by the Sentencing Commission – medical, age and family circumstances. Significantly, despite having been given the authority to do so, the BOP has not identified what other reasons may support compassionate release.

Until Congress amended the compassionate release statute in the FSA, the BOP had the exclusive authority to move for a sentence reduction.[4] With that authority came the sole responsibility for determining what reasons other than medical condition, age, and family circumstances qualified as extraordinary and compelling. If the BOP did not consider a defendant's reason extraordinary and compelling and did not file a motion, the defendant had no recourse to the courts.[5] Consequently, there was no way to discern what circumstances, if any, constituted an extraordinary and compelling reason other than the enumerated ones.

The process changed when Congress passed the FSA in December 2018. Congress displaced the BOP as the exclusive gatekeeper of motions for sentence reductions. Now, a defendant, after exhausting administrative remedies, may move for a reduction under 18 U.S.C. § 3582(c)(1)(A).

Congress changed the process in reaction to the BOP's inconsistent and infrequent use of the compassionate release mechanism. The BOP had filed few

---

[4] "How the First Step Act Changed Federal Compassionate Release," Compassionate Release: A Project by Brandon Sample, Attorney at Law (2020), https://compassionaterelease.com/first-step-act-compassionate-release/.

[5] *Id.*

motions.[6] From 1984 to 2013, the BOP filed only approximately 24 motions annually.[7] From 2013 to 2017, of the 5,400 applications for compassionate release, the BOP approved only six percent.[8] During that period, 266 people who had requested compassionate release died while awaiting the BOP's determination to file motions on their behalf.[9] The Inspector General's report finding that the BOP rarely moved for compassionate release under its own policies led the Sentencing Commission to amend its policy to encourage the BOP to use the mechanism more frequently. *See* "§ 1B1.13 (Policy Statement) – Compassionate Release," U.S. Sentencing Commission (2016), https://www.ussc.gov/sites/default/files/elearning/2016-guideline-amendments/story_content/external_files/Comp%20Release.pdf (announcing the broadening of eligibility criteria for compassionate release to expand the pool of candidates). A defendant himself may now move for a sentence reduction after exhausting administrative remedies. 18 U.S.C. § 3582(c)(1)(A).

To exhaust administrative remedies, a defendant must first present his request for compassionate release to the warden. After 30 days of submitting the request, the defendant may move for compassionate release in the district court, whether the warden has denied the request or has not acted. *Id.*; *United States v. Raia*, 954 F.3d 594, 595-96 (3d Cir. 2020).

---

[6] *United States v. Redd*, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the [BOP] filed motions for a sentence reduction on behalf of defendants.").

[7] *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)).

[8] "How the First Step Act Changed Federal Compassionate Release," *supra* note 4.

[9] *Id.*

Spencer has properly exhausted administrative remedies. He filed a written request with the warden on April 10, 2020.[10] On May 7, 2020, the BOP conducted a medical examination.[11] Based on the evaluation, the warden denied his request.[12] More than 30 days have passed since the warden received Spencer's request. Therefore, we now consider the motion.

The threshold issue is whether the COVID-19 pandemic is an extraordinary and compelling reason for reducing the defendant's sentence. Neither the Sentencing Commission nor the BOP has determined that it is. Indeed, as we previously noted, they have not identified any "other reasons" that qualify for a sentence reduction. Thus, the question is whether, absent such a determination, a court may decide what is an extraordinary and compelling reason for compassionate release.

The Third Circuit has not ruled on this issue.[13] The Second, Fourth, Sixth and Seventh Circuits have, holding that district courts have discretion to determine what constitutes an "extraordinary and compelling" reason justifying compassionate release. *U.S. v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020); *U.S. v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *7 (4th Cir. Dec. 2, 2020); *U.S. v. Jones*, No. 20-3701, 2020 WL 6817488, at *7 (6th Cir. Nov. 20, 2020); *U.S. v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020). They reason that until the Sentencing Commission updates the policy statements to reflect the FSA's changes,

---

[10] Def.'s Mot. to Reduce Sent. Ex. D (ECF No. 67).

[11] Govt.'s Resp. at 5 (ECF No. 69).

[12] *Id.*

[13] This issue is pending appeal in the Third Circuit. *See United States v. Andrews*, No. 20-2768.

there is no applicable policy statement for prisoner-initiated motions for compassionate release. No circuit has held otherwise.

The Sentencing Commission, for lack of a quorum,[14] has not updated Sentencing Guideline Section 1B1.13, its commentary or application notes. The outdated guideline does not take into account that the BOP is no longer the gatekeeper to the courts and the sole determiner of what "other reasons" are extraordinary and compelling. The Sentencing Commission itself recognizes that its policy statement and commentary are outdated in light of the FSA's changes. *See* "Compassionate Release," *The First Step Act of 2018: One Year of Implementation*, United States Sentencing Commission, at 47 (August 2020), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/ 2020/20200831_First-Step-Report.pdf. As the Commission acknowledges, "[t]he statutory changes made by the First Step Act did not make any changes to the Guidelines Manual, nor did the Act provide emergency amendment authority to the Commission. Thus, the policy statement at § 1B1.13 does not reflect the First Step Act's changes." *Id*.

It was not unreasonable for the Sentencing Commission to delegate the authority to the BOP to define what was an extraordinary and compelling reason because the BOP was the gatekeeper. The Commission had no need to issue a policy statement explicating other reasons for granting motions because courts had no real role in deciding what was a qualifying reason.

---

[14] The Sentencing Commission is currently unable to update Section 1B1.13 or its commentary because it lacks the necessary quorum. "ESP Insider Express Special Edition: First Step Act," United States Sentencing Commission, Office of Education & Sentencing Practice at 5 (February 2019), https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act.pdf.

Now, the courts have the power to grant motions without the BOP's moving or approving them. To permit the BOP to define what reasons qualify for compassionate release would essentially give it a gatekeeping role, one that Congress took from it.

Given that the BOP is no longer the gatekeeper, it cannot set the policy for compassionate release. It makes no sense to have the BOP determine what is an extraordinary and compelling reason for reduction when it no longer exclusively controls the process. It cannot make the rules. The Sentencing Commission policy statement is premised on a process that Congress has replaced. The Commission, for reasons not of its making, has not issued a new policy statement taking into account the change to the process entrusting the courts with the power to grant sentence reductions upon a defendant's motion without the BOP's input.

The statute provides that a reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). There is no longer any policy statement that applies because Congress changed the process, significantly diminishing the role of the BOP in it. There is no reason for the Sentencing Commission, when it eventually has a quorum, to delegate authority to the BOP to decide what "other reasons" qualify as extraordinary and compelling.

Not to implement these changes now would frustrate the will of Congress, which intended that compassionate release be used more often and on a broader scope. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194 (2018), entitled "Increasing the Use and Transparency of Compassionate Release."[15] Legislative history

---

[15] The title and preamble of an act can provide insight into its meaning. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 34, at 218 (2012) (Preambles "set forth the assumed facts and the purposes that the majority of the enacting legislature . . . had in mind, and these can shed light on the meaning of the operative provisions that follow"); *Almendarez-Torres v. United States*, 523 U.S. 224,

supports this conclusion. Senator Cardin explained: "[T]he bill expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. Rec. 192, at S7314, 2018 WL 6350790 (Dec. 5, 2018). *See also* 164 Cong. Rec. 201, at H10362 (Dec. 20, 2018) (statement of Rep. Nadler) ("The prison reform provisions of this bill also include a number of very positive changes, such as . . . improving application of compassionate release").

To continue relying on BOP criteria and allowing the BOP to delineate the grounds for a sentence reduction under Section 3582(c)(1)(A) would be inconsistent with the amended statute. It would allow the BOP to continue exercising a gatekeeping role by defining or limiting the grounds for compassionate release. Likewise, the Sentencing Commission's outdated guideline and commentary is inconsistent with the letter and the spirit of the current compassionate release statute.[16] On the other hand, a court determining what constitutes a qualifying extraordinary and compelling reason is not inconsistent with any policy statement issued by the Sentencing Commission. There is no applicable policy statement to the contrary. Thus, we conclude that a court has the authority and responsibility to determine what is an extraordinary and compelling reason for a sentence reduction under Section 3582(c)(1)(A).

### COVID-19

We now consider whether the COVID-19 pandemic and its impact on the prison population in a given case may warrant relief under Section 3582(c)(1)(A).

---

234 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528–529 (1947)) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute."); *I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

[16] The Guidelines Manual Commentary is authoritative unless it violates a federal statute or is inconsistent with the guideline. *United States v. Stinson,* 508 U.S. 36, 38 (1993).

A generalized, non-specific threat of harm due to the COVID-19 pandemic alone is not a sufficient reason to grant compassionate release. As the Third Circuit stated, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597. *See also United States v. Roeder*, 807 F. App'x 157, 161 (3d Cir. 2020) ("[T]he existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence.").

To determine whether extraordinary and compelling reasons exist in an individual case, we consider the circumstances of the COVID-19 pandemic, the defendant's health conditions, the defendant's age, the risk of contracting COVID-19 at the defendant's facility, and the defendant's ability to receive adequate medical care in prison. None of these reasons alone is an extraordinary or compelling reason. Health complications without the risk of COVID-19 at a particular institution do not warrant release. Similarly, the fact that a facility may have confirmed cases of COVID-19 does not justify release if the defendant is not at risk due to age or other medical conditions. However, a combination of these circumstances may rise to the level of "extraordinary and compelling." Hence, each case must be determined by the facts unique to the defendant.

1. Background on the COVID-19 pandemic

The novel coronavirus, or SARS-CoV-2, is a virus that causes COVID-19, a serious respiratory disease that makes people severely ill, requiring hospitalization and

in some cases leading to death.[17] COVID-19 is estimated to be ten times more lethal than the seasonal flu, with about 20% of infected patients requiring hospitalization.[18] As of February 12, 2021, COVID-19 has infected over 106 million people worldwide, resulting in over 2.3 million deaths.[19]

COVID-19 is highly infectious and spreads through respiratory droplets produced from talking, coughing or sneezing.[20] Many infected people are asymptomatic but may still transmit the virus.[21] In fact, experts believe that asymptomatic people may be one of the driving forces behind the spread of the outbreak.[22] The only way to slow the spread

---

[17] *See* "Q&A on coronaviruses (COVID-19)," World Health Organization (Apr. 17, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

Like COVID-19, Severe Acute Respiratory Syndrome (SARS), first identified in 2003, is caused by a coronavirus known as SARS-CoV. "COVID-19 vs. SARS: How Do They Differ?," Healthline (April 29, 2020), https://www.healthline.com/health/coronavirus-vs-sars. Middle East Respiratory Syndrome (MERS), first identified in 2012, is caused by a coronavirus known as MERS-CoV. *Id.* SARS and COVID-19 share many similarities, including their method of transmission, their symptoms, and the dangers they pose to certain at-risk groups. *Id.*

[18] Pien Huang, "How The Novel Coronavirus And The Flu Are Alike . . . And Different," NPR (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different; "Similarities and Differences between Flu and COVID-19," Centers for Disease Control and Prevention (July 10, 2020), https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm.

[19] "WHO Coronavirus Disease (COVID-19) Dashboard," World Health Organization, https://covid19.who.int/ (updated daily).

[20] *Id.*

[21] "Transmission of SARS-CoV-2: implications for infection prevention precautions," World Health Organization (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions; Nathan Furukawa, John Brooks and Jeremy Sobel, "Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic," 26.7 EID Journal (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[22] Seyed Moghadas, Meagan Fitzpatrick, Pratha Sah, Abhishek Pandey, Affan Shoukat, Burton Singer and Alison Galvani, "The implications of silent transmission for the control of COVID-19 outbreaks," PNAS (July 6, 2020), https://www.pnas.org/content/early/2020/07/02/2008373117.

of COVID-19 is to conduct widespread testing, and enforce wearing face masks in public settings and other social distancing measures.[23]

The United States is the world leader in COVID-19 diagnoses, with over 26.9 million confirmed cases and more than 464,000 deaths.[24] The number of confirmed cases in the United States continues to rise.[25] Experts believe the reported numbers underrepresent the outbreak's true spread, as many areas are not conducting enough testing.[26] The federal government and every state declared states of emergency, with more than half of the states and the District of Columbia imposing lockdown restrictions on their residents at different times and for varying periods of time.[27] The Third Circuit has recognized that the COVID-19 pandemic "has given rise to exceptional and exigent circumstances that require the prompt attention of the courts." *Roeder*, 807 F. App'x at 161.

---

[23] "WHO Coronavirus Disease (COVID-19) Dashboard," World Health Organization, https://covid19.who.int/ (updated daily).

[24] Donald McNeil, Jr., "The U.S. Now Leads the World in Confirmed Coronavirus Cases," The New York Times (Mar. 26, 2020), https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html; "WHO Coronavirus Disease (COVID-19) Dashboard," *supra* note 23.

[25] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lostfebruary/608521/.

[26] *Id.*

[27] *See* Rachel Treisman, "Which States Are Reopening? A State-By-State Guide," NPR (June 29, 2020), https://www.npr.org/2020/03/12/815200313/what-governors-are-doing-to-tackle-spreading-corona virus; "Lockdowns, closures: How is each US state handling coronavirus?" Al Jazeera (Apr. 14, 2020), https://www.aljazeera.com/news/2020/03/emergencies-closures-states-handling-coronavirus-2003172133 56419.html.

2.  Spencer's medical condition(s)

The U.S. Centers for Disease Control and Prevention have identified a number of health conditions and complications that place individuals at greater risk of severe illness, hospitalization and death from COVID-19. Among these risk factors are seizures and other neurological disorders,[28] which Spencer has. According to a study in Spain, a COVID-19 infection can increase the frequency of seizures and other comorbid psychiatric disorders in patients with epilepsy.[29] Spencer was shot in the head in 2011, and suffers seizures from this prior injury.[30] He takes anti-seizure medication, but he still experiences frequent grand mal seizures, including seven in the past year alone.[31] On several occasions, he fell and hit his head during a seizure, causing injury.[32] Though he is scheduled to see a neurologist and receive a CT scan of his brain, he has not received this necessary medical care in prison due to the COVID-19 pandemic.[33] Spencer's condition combined with the lack of adequate medical treatment in prison puts him at greater risk for illness, injury or death from COVID-19.

---

[28] "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions," Centers for Disease Control and Prevention (Feb. 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; "If you are at higher risk: How to reduce risk of infection and what to do if you get sick," Harvard Medical School (Jan. 28, 2021), https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk.

[29] Julia Ernst, MS, "Survey examines impact of COVID-19 pandemic among patients with epilepsy," Healio (Aug. 27, 2020), https://www.healio.com/news/neurology/20200826/survey-examines-impact-of-covid19-pandemic-among-patients-with-epilepsy.

[30] Def.'s Mot. to Reduce Sent. Ex. C; Def.'s Reply Ex. A at 1 (ECF No. 70).

[31] Def.'s Mot. to Reduce Sent. at 2, 12; Def.'s Supp. Am. to Mot. to Reduce Sent. at 3 (ECF No. 76).

[32] Def.'s Mot. to Reduce Sent. at 2; Def.'s Reply Ex. B.

[33] Def.'s Mot. to Reduce Sent. Ex. C; Def.'s Supp. Am. to Mot. to Reduce Sent. at 3-4.

Spencer also tested positive for tuberculosis.[34] The CDC estimates that as many as 13 million people in the United States have latent, or asymptomatic, TB.[35] It recognizes that "the incarcerated population contains a higher proportion of people at greater risk for TB than the overall population."[36] For individuals with latent TB, "contracting COVID-19 could activate the bacterium, potentially leading to an accelerated and more severe form of the disease which could lead to hospitalization and rapid death."[37] Both TB and COVID-19 are airborne, transmitted through coughing, sneezing and other close contact.[38] If Spencer becomes infected with COVID-19, it could aggravate his TB condition, increasing his chances of suffering severe illness or death. According to the CDC, "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[39]

---

[34] Def.'s Reply Ex. E. This diagnosis requires follow-up tests to confirm the results. *Id.*; Govt. Resp. at 6. At the time of the parties' briefing, the follow-up tests had not been conducted. Def.'s Reply Exs. C, D; Govt. Resp. at 6.

[35] "Tuberculosis (TB): Data and Statistics," Centers for Disease Control and Prevention (Oct, 29, 2020), https://www.cdc.gov/tb/statistics/default.htm; "Tuberculosis (TB): Fact Sheets," Centers for Disease Control and Prevention (Oct. 20, 2014), https://www.cdc.gov/tb/publications/factsheets/general/ltbiand activetb.htm#:~:text=What%20is%20Latent%20TB%20Infection,test%20or%20TB%20blood%20test.

[36] "Tuberculosis (TB): TB in Correctional Facilities in the United States," Centers for Disease Control and Prevention (Oct. 23, 2020), https://www.cdc.gov/tb/topic/populations/correctional/default.htm.

[37] Padma Nagappan, "COVID-19 Could Activate Latent Tuberculosis," NewsCenter, San Diego State University (Sep. 22, 2020), https://newscenter.sdsu.edu/sdsu_newscenter/news_story.aspx?sid= 78173.

[38] *Id.*

[39] "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions," *supra* note 28.

The risk for severe illness or death from COVID-19 increases with age, with adults aged 65 or older at highest risk.[40] The risk for severe illness or death from COVID-19 increases with age.[41] Although the CDC initially highlighted adults aged 65 and older as at risk, it has determined after analyzing cases across the United States that people of any age are at higher risk relative to younger age groups.[42] Death counts rise with each decade of age.[43] People aged 50 or older are at higher risk than people in their 40s.[44] People in their 60s and 70s are at higher risk than those in their 50s.[45] Spencer is 46 years old.[46] His age therefore makes him vulnerable to severe illness or death from COVID-19 relative to younger incarcerated persons.

---

[40] "Coronavirus Disease 2019 (COVID-19): Older Adults," Center for Disease Control and Prevention (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[41] *Id.*

[42] Brenda Goodman, "CDC Updates COVID-19 Risk Factors," WebMD (June 25, 2020), https://www.webmd.com/lung/news/20200625/cdc-updates-covid-19-risk-factors.

[43] Erin Schumaker, "Risk for severe COVID-19 increases with each decade of age," abcNEWS (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642 (citing Robert Verity et al., *Estimates of the severity of coronavirus disease 2019: a model-based analysis*, Lancet Infectious Diseases (Mar. 30, 2020), https://doi.org/10.1016/S1473-3099(20)30243-7). *See also* "Weekly Updates by Select Demographic and Geographic Characteristics: Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)," Centers for Disease Control and Prevention, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex.

[44] "Weekly Updates by Select Demographic and Geographic Characteristics," *supra* note 43.

[45] *Id.*

[46] Def.'s Reply Ex. A at 1.

### 3. Risk of COVID-19 infection in prison

In the United States, roughly 2.1 million adults are incarcerated.[47] The CDC has recognized the particular vulnerability of incarcerated persons to COVID-19 infection in its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." According to the CDC, correctional and detention facilities present "unique challenges for control of SARS-CoV-2 transmission among [inmates], staff, and visitors."[48] Incarcerated people live, work, eat, study and participate in activities in congregate environments, with few options for social distancing due to crowded conditions.[49] Daily staff movements, transfers of people between facilities and systems, and visits from outsiders such as family or legal representatives create many opportunities to introduce COVID-19 to a facility.[50] The high turnover rate at correctional and detention facilities, as well as residents often coming from a variety of geographic locations, adds to the risk.[51] *See also Raia*, 954 F.3d at 596 (noting that COVID-19 is "a highly contagious respiratory virus which . . . exposes unique risks in population-dense prison facilities") (citations omitted).

---

[47] Laura Maruschak and Todd Minton, "Correctional Populations in the United States, 2017-2018," Office of Justice Programs: Bureau of Justice Statistics at 1-2 (August 2020), https://www.bjs.gov/content/pub/pdf/cpus1718.pdf.

[48] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," Centers for Disease Control and Prevention (July 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[49] *Id.*

[50] *Id.*

[51] *Id.*

These risks are real. As of June 16, the five largest known clusters of COVID-19 in the United States grew inside correctional facilities.[52] In May, the number of confirmed cases among prisoners doubled and deaths increased by 73 percent.[53] One in seven tests conducted on prisoners was positive.[54] The majority of infected people in prison are asymptomatic, but can still transmit the virus to more vulnerable people.[55] Since the outbreak began, 220 people in federal custody and 4 BOP staff members have died from COVID-19.[56] Over 45,900 prisoners and 6,200 staff have tested positive.[57] There are confirmed active cases at 127 BOP facilities.[58] It is reported that incarcerated persons are being infected at a rate more than 6.5 times higher than in the United States.[59] To address the rapid spread of COVID-19 in federal prisons, Congress passed the CARES Act authorizing the Attorney General to expand the use of home confinement to protect vulnerable prisoners from COVID-19 infection.[60] Despite this legislative expansion, the

---

[52] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide* (June 16, 2020), https://www.nytimes.com/2020/06/16/us/coronavirusinmates-prisons-jails.html.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Bureau of Prisons, "COVID-19 Coronavirus" (updated daily), https://bit.ly/2SOsQpe.

[57] *Id.*

[58] *Id.*

[59] "Defender Community Urges Legislative Action to Address COVID-19 Humanitarian Crisis in Federal Prisons," Federal Defender Services Office, Training Division (May 11, 2020) https://www.fd.org/news/defender-community-urges-legislative-action-address-covid-19-humanitarian-crisis-federal; "BOP-Reported Positive Tests for COVID-19 Nationwide," Federal Defenders of New York (2020), https://federaldefendersny.org/assets/uploads/BOP_Numbers.4.20.pdf.

[60] *Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2)(2020) ("CARES Act").

BOP has transferred less than 5 percent of the individuals in its custody to home confinement.[61]

Spencer is incarcerated at FCI Fort Dix, a facility with a significant COVID-19 outbreak. There are 186 active cases of COVID-19 among inmates at FCI Fort Dix, and 36 among staff.[62] The first inmate death occurred in January 2021.[63] FCI Fort Dix consists of a low-security facility with a minimum security satellite camp.[64] The facility's dormitory-style housing holds anywhere from two to twelve inmates per room.[65] Videos purportedly taken by prisoners inside the facility's quarantine unit show overflowing trashcans and scattered debris due to the shortage of healthy staff and inmate workers.[66] Families and advocates blame the outbreak on the BOP "for transferring 150 prisoners this fall from Ohio's FCI Elkton, where more than 1,000 prisoners and staff have been infected."[67] With 1,818 positive tests recorded, FCI Fort Dix has the highest number of infections in the

---

[61] *See* "COVID-19 Coronavirus," *supra* note 56.

[62] *Id.*

[63] George Woolston, "FCI Fort Dix sees first inmate death due to COVID, officials report," Burlington County Times (Jan. 25, 2021), https://www.burlingtoncountytimes.com/story/news/2021/01/25/fci-fort-dix-sees-first-inmate-death-due-covid-19-coronavirus-federal-prison-south-jersey/6701369002/.

[64] "Fort Dix Federal Correctional Institution," PrisonPro (2021), https://www.prisonpro.com/content/fort-dix-federal-correctional-institution.

[65] *Id.*

[66] Samantha Melamed, "COVID-19 outbreak infecting hundreds at Fort Dix is 'escalating crisis,' N.J. senators warn," The Philadelphia Inquirer (Nov. 10, 2020), https://www.inquirer.com/news/fci-fort-dix-coronavirus-covid-outbreak-transfers-elkton-cory-booker-bob-menendez-20201110.html.

[67] *Id.*

federal system.[68] Spencer attests that he is currently housed in a unit with over 54 confirmed cases of COVID-19.[69]

In November 2020, U.S. Senators Cory Booker and Bob Menendez sent a letter to the BOP calling the situation a "rapidly escalating crisis" demanding an indefinite moratorium on inmate transfers and immediate testing of all prisoners and staff.[70] They stated that "[i]t is clear that BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferred between facilities" and that "all FCI Fort Dix inmates, staff, and the surrounding communities are now at increased risk for contracting COVID-19, with potentially deadly consequences."[71]

We find that the combination of these circumstances rises to the level of "extraordinary and compelling." Spencer suffers from several serious medical conditions associated with increased risk for COVID-19. The BOP has not been able to provide adequate medical care to treat his conditions, including a neurological examination for his repeated seizures and follow-up tests to confirm his TB diagnosis, due to the pandemic. He is housed at a facility where over 1,800 inmates have contracted the virus, and at least one has died. His current unit has 54 confirmed cases. He is at continual risk for infection due to FCI Fort Dix's living conditions, which could prove fatal. As Judge Brody noted, for defendants facing certain health risks, "nothing could be more extraordinary and compelling than this pandemic." *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020).

---

[68] *See* "COVID-19 Coronavirus," *supra* note 56.

[69] Def.'s Am. to Mot. to Reduce Sent. (ECF No. 75).

[70] *See* Melamed, *supra* note 66.

[71] *Id.*

19

*Danger to the Community*

Not every defendant who presents a qualifying extraordinary and compelling reason is entitled to relief under Section 3582(c)(1)(A). The Section 3553(a) factors may militate against a sentence reduction. Likewise, a Section 3142(g) finding that the defendant may present "a danger to any other person or to the community" precludes a sentence reduction. U.S.S.G. § 1B1.13(2).

Before granting a motion for compassionate release based on an extraordinary and compelling reason, a court must find that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). The applicable Section 3142(g) factors include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The government argues that Spencer presents an economic danger to the community.[72] It contends that Spencer cannot stop himself from committing further bank fraud, including while he was awaiting sentencing and in his present incarceration.[73] It cites his disciplinary history in prison as evidence of his risk of recidivism.[74]

---

[72] Govt. Resp. at 1.

[73] *Id.* at 17; Govt. Supp. Resp. at 1-3 (ECF No. 72).

[74] Govt. Supp. Resp. at 1-2.

Spencer admitted his conduct, pled guilty and self-surrendered.[75] He has demonstrated remorse.

Spencer has four prior convictions, three of which occurred more than twenty years ago when he was in his mid-twenties. None were for violent offenses. Two were related to his part in the same bank fraud scheme using false identification documents. One was for theft by deception. His fourth conviction was for possession of drug paraphernalia, specifically for preparing and smoking marijuana.

Spencer has had only two minor disciplinary incidents in prison for possession of cigarettes in May 2018 and a cell phone in July 2018.[76] In June 2020, he was moved to a Segregated Housing Unit ("SHU") for unauthorized possession of a cell phone, which contained text messages suggesting that he was committing additional fraud in prison.[77] The government claims the cell phone was found in Spencer's cell, but Spencer contends it was found in a common area.[78] He asserts that the BOP investigated the incident, cleared him of any wrongdoing and expunged the incident from his records.[79] To corroborate his statements, he submitted a copy of an Inmate Request Form to Staff in which he requested written evidence that the incident had been expunged.[80] His counselor responded "[a]s per the [Disciplinary Hearing Officer], nothing is given in writing

---

[75] Def.'s Mot. to Reduce Sent. at 1-2; Def.'s Supp. Am. to Mot. to Reduce Sent. at 6; Judg. in Crim. Case (ECF No. 31).

[76] Def.'s Supp. Am. to Mot. to Reduce Sent. Ex. D; Govt. Resp. at 4.

[77] Govt. Supp. Resp. at 1-2, Ex. A.

[78] Id. at 1; Def.'s Supp. Am. to Mot. to Reduce Sent. at 4.

[79] Def.'s Supp. Am. to Mot. to Reduce Sent. at 4-5.

[80] Id. Ex. B.

showing an incident report was expunged. Your discipline history is on the team sheet and will not display expunged reports."[81] The government has not rebutted his version of events.

We find that Spencer does not present a danger to others or the community.

*Section 3553(a) Factors*

Section 3582(c)(1)(A) requires a court to consider whether a sentence reduction is warranted under the factors detailed in 18 U.S.C. § 3553(a) before granting a sentence reduction. Section 3553(a) instructs district courts to "impose a sentence 'sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). Similar to the Section 3142(g) factors, the applicable Section 3553(a) factors include: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide punishment, deter criminal conduct and protect the public from further crimes by the defendant; (3) the kinds of sentences and sentencing ranges available; and (4) the need to avoid unwarranted sentence disparities among defendants committing similar offenses. 18 U.S.C. § 3553(a).[82]

Spencer has already served almost 36 months. He will serve five years of supervised release under stringent conditions. He was scheduled to be released on October 13, 2020, provided he completed a residential drug treatment program

---

[81] *Id.*

[82] Because Section 3553(a) establishes factors for courts to consider when initially imposing a sentence, not every factor listed applies to the compassionate release context. *Rodriguez*, 451 F. Supp. 3d at 406.

("RDAP").[83] In February 2020, he appeared at a hearing in the district court in connection with a habeas petition, causing him to miss two months of RDAP attendance.[84] As a result, he was not able to complete his remaining 81 hours before the COVID-19 pandemic forced the BOP to suspend the program.[85] His release date is now scheduled for October 13, 2021.[86] As a convicted felon, he will face numerous collateral consequences in his life after incarceration.[87] Thus, a reduced prison sentence will provide punishment and deter future criminal conduct, and will not diminish the seriousness of his offense and respect for the law.

Spencer has a release plan that has already been approved by his probation officer.[88] He has taken advantage of the various courses and programs available to him in prison, including RDAP.[89] Upon release, he will live with his mother in Wynnewood, Pennsylvania.[90]

Spencer is 46 years old with several serious health conditions that put him at increased risk for severe illness or death from COVID-19. He has not been able to receive adequate medical care for his seizure disorder or his TB diagnosis in prison. His continued

---

[83] Govt. Resp. at 4.

[84] *Id.*

[85] *Id.*

[86] "Find an inmate," Federal Bureau of Prisons, https://www.bop.gov/inmateloc/.

[87] Collateral Consequences of Conviction Project, American Bar Association, https://www.americanbar.org/groups/criminal_justice/niccc/ (cataloging "over 45,000 federal and state statutes and regulations that impose collateral consequences on persons convicted of crimes").

[88] Def.'s Mot. to Reduce Sent. at 13.

[89] Def.'s Supp. Am. to Mot. to Reduce Sent. at 5, Ex. C.

[90] Def.'s Mot. to Reduce Sent. at 13.

incarceration not only makes him vulnerable to COVID-19, but will also interfere with his ability to receive necessary medical care should he have another seizure. 18 U.S.C. § 3553(a)(2)(D). These factors weigh in favor of a sentence reduction.

*Rehabilitation*

What has happened since a defendant was sentenced is relevant. It presents the most up-to-date information and amplifies or supplements the history and characteristics of the defendant. It informs the assessment of whether the defendant is deserving of any or no reduction in his sentence, and whether he is a danger to the community. It also provides insight into whether the defendant has been rehabilitated – an insight the sentencing court did not have. Indeed, evidence of post-sentencing rehabilitation is "highly relevant" to the Section 3553(a) factors. *Pepper v. United States*, 562 U.S. 476, 491 (2011). Hence, even though rehabilitation alone is not a ground for release or a sentence reduction under Section 3582(c)(1)(A), *see* 28 U.S.C. § 994(t), it is a relevant factor bearing on the analysis.

During his two years in prison, Spencer's conduct and amenability to rehabilitation have been revealed to prison authorities. Ironically, on consideration of a motion under Section 3582, a court is in a better position to assess Spencer's potential for rehabilitation than the sentencing court was almost three years ago. Thus, we shall consider Spencer's rehabilitation together with other factors in the extraordinary and compelling analysis, the danger to the community assessment, and the Section 3553(a) factors.

Spencer has shown that he is committed to his rehabilitation, further supporting his release. While incarcerated, Spencer has completed over 30 courses on topics

ranging from Spanish, to parenting, to health and fitness.[91] He has completed 419 out of the required 500 hours of RDAP, which the BOP describes as its "most intensive treatment program."[92] He would have completed the program and been released by now if not for the interruption of his court hearing and the COVID-19 pandemic.

## Conclusion

We find that the combination of the COVID-19 pandemic, Spencer's compromised health, the risk of COVID-19 infection at FCI Fort Dix and the inadequacy of the medical care Spencer is receiving in prison constitute extraordinary and compelling reasons to grant a sentence reduction. Spencer's age and health place him at grave risk of severe illness or death if he continues to serve his sentence at FCI Fort Dix. Spencer is not a danger to the community, and the Section 3553(a) factors support compassionate release. Therefore, we shall grant Spencer's motion for a sentence reduction.

---

[91] Def.'s Supp. Am. to Mot. to Reduce Sent. Ex. C.

[92] "Substance Abuse Treatment," Federal Bureau of Prisons, https://www.bop.gov/inmates/custody _and_care/substance_abuse_treatment.jsp.